## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PECUS ARG HOLDING, INC., et al.,[1] | Case No. 09-10170 (___) |
| Debtors. | (Joint Administration Pending) |

## DECLARATION OF LISA M. POULIN
## IN SUPPORT OF FIRST DAY MOTIONS

I, Lisa M. Poulin, declare as follows:

1.     I am the Chief Restructuring Officer Pecus ARG Holding, Inc. ("ARG Holding")[2], ARG Enterprises, Inc. ("ARG Enterprises"), and ARG Property Management Corporation ("ARG Property Management," together with ARG Holding and ARG Enterprises, the "Debtors" or the "Company"). The Debtors are debtors in possession in the above-captioned chapter 11 cases. I also am a partner in CRG Partners Group LLC ("CRG"), an interim management and restructuring advisory firm. I am duly authorized to submit this Declaration on behalf of the Debtors.

2.     The Debtors engaged CRG in November 2008 to provide restructuring services to the Debtors. CRG has extensive experience in providing advisory services in restructurings and reorganizations in large and complex chapter 11 cases. In addition, the Debtors engaged me to be the Chief Restructuring Officer of each of the Debtors. I have extensive experience assisting operationally and financially distressed organizations in out-of-court workouts and chapter 11 reorganizations.

---

[1] The Debtors comprise the following entities: Pecus ARG Holding, Inc., Tax I.D. No. xx-xxxxxxx; ARG Enterprises, Inc., Tax I.D. No. xx-xxxxxxx; and ARG Property Management Corporation, Inc., Tax I.D. No. xx-xxxxxxx. The address for Pecus ARG Holding, Inc., is 2929 Arch Street, Philadelphia, PA 19104-2868. The address for ARG Enterprises, Inc., and ARG Property Management, Inc., is 4410 El Camino Real, Suite 201, Los Altos, CA 94022.

[2] All capitalized terms not herein defined shall have the same meaning as ascribed in the motion being described.

3.     As Chief Restructuring Officer, with the assistance of the Debtors' senior management, I presently am involved on a day-to-day basis with all aspects of the Debtors' reorganizational affairs, including business operations, strategic planning, financial reporting, human resources, legal affairs, and other management activities, including the Debtors' efforts to address their current financial difficulties.

4.     As a consequence of my position with the Debtors, I have reviewed and worked extensively with the books and records of the Debtors, including their business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes, correspondence, and other business records.  On a regular basis, I participate in negotiations with lenders, vendors and other creditors of the Debtors, and work closely with personnel from all aspects of the Debtors' business operations to assist in the management of the Debtors' affairs.

5.     Based upon all of the foregoing, I have developed an intimate familiarity with: (i) the Debtors' books and records, which are maintained in the ordinary course of business under my supervision and control as custodian (and under the control of other members of senior management), (ii) the Debtors' business and financial history, and their current business and financial situation, (iii) the financial and operational details of the Debtors' business operations, and (iv) the restaurant industry generally.

6.     I submit this Declaration in support of the "first day" motions and applications (collectively, the "First Day Motions") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") in the Debtors' Chapter 11 cases.  I am familiar with the contents of each of the First Day Motions (including the exhibits thereto) and I believe each of the First Day Motions is (a) necessary to enable the Debtors to enter and operate in Chapter 11

with minimum disruption and loss of productivity or value and (b) is in the best interests of the Debtors' estates, creditors and stakeholders.

7.     Part I of this Declaration provides the Debtors' background, capital structure and a summary of the events leading to the bankruptcy cases and Part II provides the relevant facts supporting the Debtors' First Day Motions.

**PART I**

**BACKGROUND**

8.     On the date hereof the Debtors each filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the Court.

9.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107 and 1108. No trustee, examiner or committee has been appointed in the Debtors' Chapter 11 cases.

**The Debtors' Businesses**

10.     The Company, headquartered in Los Altos, California, owns and operates the Black Angus Steakhouse chain of casual steakhouse restaurants (the "Black Angus Restaurants"), specializing in 100% all-natural Black Angus steak and prime rib, and seafood entrees. The original Black Angus Steakhouse was opened in Seattle in 1964 and the chain now comprises 69 restaurants located in 7 western states (Alaska, Arizona, California, Hawaii, New Mexico, Nevada and Washington). The Company leases its corporate office space and 51 of the restaurants, and owns 31 buildings under long-term land lease agreements.[3] The Debtors employ more than 3600 individuals, approximately 290 of whom are salaried and approximately 3340 of

---

[3] For some Restaurants, the Debtors lease both the building and the land. Thus, the Debtors may be party to two leases for one Restaurant. The Company also one land-lease where the restaurant was never built.

whom are hourly workers. The Company projects gross revenue in 2008 of approximately $181 million.

11.     ARG Holding, a Delaware corporation, is a holding company that owns 100% of the stock of ARG Enterprises and ARG Management. ARG Enterprises, a California corporation, operates the Debtors' restaurants and, as of the Petition Date, was the lessee of seventy-three (73) real property and related improvements leases. ARG Property Management does not operate any restaurants; as of the Petition Date, ARG Property Management was the lessee of eighteen (18) real property and related improvements leases.

**Assets and Liabilities**

### A.     Assets

12.     Based on the Debtors' unaudited, consolidated balance sheet, as of December 1, 2008, the Debtors' assets included the following on a book-value basis: (i) net property and equipment of approximately $37.6 million; (ii) inventories of approximately $2.4 million; (iii) accounts receivable of approximately $938,000; (iv) cash and cash equivalents of approximately $0.00; (v) net intangible assets of approximately $87.6 million; (vi) other assets (including deposits) of approximately $627,000; and (vii) prepaid goods and services of approximately $3 million.

### B.     Secured Debt

13.     ARG Enterprises and ARG Management are obligated to Pecus ARG Main, LLC ("Pecus Main" and Pecus ARG Parallel, LLC ("Pecus Parallel" and, together with Pecus Main, the "Prepetition Lenders")[4] as assignees of the lender parties to that certain Credit Agreement

---

[4] Pecus Main is wholly owned by Versa Capital Fund I, L.P. ("Versa Capital") and Pecus Parallel is wholly owned by Versa Capital Fund I Parallel, L.P. ("Versa Capital Parallel", and together with Versa Capital, the "Versa Funds"). The Versa Funds are the ultimate owners of ARG Holding, the parent Debtor entity in this proceeding, through their ownership interests in Pecus ARG Investments, Inc., a non-debtor entity.

dated as of July 11, 2005 between Wells Fargo Foothill, Inc. as arranger and administrative agent, and American Restaurant Group, Inc., ARG Enterprises and ARG Property Management as borrowers (as amended, restated, supplemented and modified from time to time, the "Prepetition Credit Agreement"). As of the Petition Date, approximately $53.1 million was outstanding under the Prepetition Credit Agreement (the "Prepetition Obligations"), comprising approximately $17.9 million in advances under a revolving credit facility ("Revolver"), approximately $20.0 million under a term B loan, approximately $10.5 million of overadvances; and approximately $4.7 million of accrued, unpaid and capitalized interest and fees. Additionally, $13.2 million has been reserved for outsanding letters of credit. Pursuant to that certain Security Agreement dated as of July 11, 2005, the Prepetition Obligations are secured by, inter alia, substantially all of the Debtors' assets.

### C. Unsecured Debt

14. Based upon the Debtors' unaudited, consolidated balance sheet, as of December 1, 2008, the Debtors' unsecured debt included the following:

> a. approximately $7.0 million owing to vendors of goods and services in connection with the operation of the Debtors' business;
>
> b. approximately $15.2 million in gift card/gift certificate liabilities (net of an anticipated $1.2 million of "breakage," *i.e.,* gift cards that the Debtors anticipate will never be redeemed);
>
> c. approximately $2.9 million in rent, percentage rent, taxes and common area maintenance charges;[5]

---

[5] The Debtors' balance sheet also includes a straight-line accrual with respect to the balance of the term of each of their leases, which is not included in the foregoing amount.

d.  approximately $2 million in capital lease obligations, incurred in connection with the implementation of the Debtors' point-of-sale and related accounting systems;

e.  approximately $3.7 million in unsecured accrued employee obligations; and

f.  a reserve of approximately $3.3 million in respect of estimated workers' compensation and general liability obligations.[6]

**D.    Equity Interests**

15.    ARG Holding is the 100% equity owner of ARG Enterprises and ARG Property Management, as successor-in-interest to Pecus Main and Pecus Parallel, which foreclosed on the stock of ARG Enterprises and ARG Property Management in April, 2008, as permitted by and in accordance with the Prepetition Credit Agreement the California Uniform Commercial Code.

**Events Leading to Bankruptcy**

16.    In 2004, American Restaurant Group, Inc. ("Old ARG"), ARG Enterprises and ARG Property Management filed for Chapter 11 protection in the United States Bankruptcy Court for the Central District of California, Los Angeles Division.  By order dated June 23, 2005, the court confirmed the First Amended Joint Plan of Reorganization of American Restaurant Group, Inc and its Affiliated Debtors, dated April 1, 2005 and the case was subsequently closed by order dated December 15, 2006 (the "2004/2005 Restructuring").  As a result of the 2004/2005 Restructuring, certain creditors accepted equity interests in Old ARG on account of their secured or general unsecured claims.  Pursuant to the Court approved 2004/2005 Restructuring, Wells Fargo Foothill ("Foothill") provided exit financing anticipated to be sufficient to execute and implement Old ARG's business plan as it emerged from Chapter 11.

---

[6] The Debtors' workers' compensation obligations are secured by letters of credit.  The amount reflected on the balance sheet for both workers' compensation and general liability does not reflect the Debtors' estimate of actual liability, but rather a multiple of that the Debtors' estimate, which is used for purposes of the Debtors' balance sheet.

This exit financing, approved by the bankruptcy court in connection with the 2004/2005 Restructuring, subsequently amended, and now held by the Prepetition Lenders, is the current Prepetition Credit Agreement.

17.     After the 2004/2005 Restructuring, approximately $25.5 million was borrowed and used to upgrade the Black Angus Restaurants, which had suffered for years from the deferral of maintenance and refurbishing. An additional $7.1 million was used to implement a new point of sale system, perform a major upgrade of the Company's information technology infrastructure, and to purchase and install new back-office software for collecting and reporting operational and financial data pertaining to the business. The Company also refreshed menu offerings, launched a "to-go" service, invested resources in improving the quality of service and employee training, added new key members to the senior management team, and closed underperforming restaurants.

18.     Notwithstanding the measures taken to improve performance, revenue and profitability continued to slide. In 2006, the Debtors generated sales of approximately $244 million and EBITDA of approximately $11 million. By 2008, sales had declined to a projected $181 million, with EBITDA of approximately $428,000. The Debtors believe that these declines are primarily due to the recessionary economic environment. Making matters worse, the Debtors' restaurants primarily are located in some of the areas hardest hit by the mortgage crisis, causing consumers in those markets to cut back on discretionary spending, such as dining out.

19.     During their respective periods of ownership prior to the Petition Date, each of Old ARG and ARG Holding unsuccessfully pursued a variety of restructuring and sale alternatives with unaffiliated entities. In March of 2007, for instance, Old ARG launched an extensive formal marketing effort to find an acquirer for the business, with the assistance of the

investment banking firm of Jeffries & Company, Inc. ("Jeffries"), who contacted over seventy (70) strategic and financial buyers. Four (4) strategic buyers executed confidentiality agreements ("CA") and two (2) requested the confidential information memorandum ("CIM"). Fifty (50) financial buyers executed CAs and thirty-seven (37) received the CIM. Ultimately, Old ARG conducted a management presentation to only three (3) potential purchasers. However, there were no offers satisfactory to Old ARG.

20.     Following the unsuccessful sales process, Old ARG engaged CRT Capital Group LLC ("CRT") in an effort to refinance the then existing Prepetition Credit Facility. CRT contacted over one hundred (100) potential investors, thirty (30) of which requested the CIM. Only one management presentation was made. CRT's efforts also were fruitless. Ultimately, in April 2008, Pecus Main and Pecus Parallel acquired the outstanding debt under the Prepetition Credit Agreement. With the facility facing maturity, and with multiple defaults under the facility and no prospects for repayment, refinancing, or sale of the enterprise, Pecus Main and Pecus Parallel foreclosed on Old ARG's stock in ARG Enterprises and ARG Property Management, which served as collateral for the obligations under the Prepetition Credit Agreement.

21.     Since acquiring ARG Enterprises and ARG Property Management, ARG Holding has sought to implement a revised operational restructuring plan in an effort to increase revenue and improve profitability. These efforts have included, among other things, (a) reducing and implementing personnel changes; (b) outsourcing the finance and payroll department; (c) reducing the number of unprofitable restaurants, changing hours for certain locations, and (d) revamping the menu and repositioning the brand.

22.     In connection with its revised operation plan, the Company has closed thirteen (13) unprofitable restaurants since April 2008, including one that was closed at the end of the

lease term. The Company hired a real estate firm specializing in marketing closed retail locations to assist in marketing the remaining closed locations. Although one location was successfully remarketed, given the market conditions and lack of demand for restaurant properties, no other marketing efforts were successful. In addition, the Company's efforts to renegotiate unprofitable or marginal leases for operating Black Angus Restaurants have been unsuccessful. The Company thus intends to immediately reject closed restaurant leases and one of the Debtors' land leases where a restaurant was never built, and to seek to renegotiate or reject leases for unprofitable or marginal restaurants.

23. The Prepetition Lenders and the Company have been working actively to implement a strategy for maximizing value and preserving the Company as a going concern. Despite the failed marketing and refinancing efforts in 2007, the Company has continued to explore strategic alternatives, including seeking out new sources of debt or equity capital or the sale of substantially all of the Company's assets. Specifically, the Company retained CRG as its exclusive financial advisor to explore the Company's options and, prior to the Petition Date, CRG again canvassed the marketplace in an effort to locate potential financial or strategic partners. To date, although some parties have indicated interest, the Company has received no firm commitments from unaffiliated entities regarding a financing or a sale.

24. Against this backdrop, the Debtors have acknowledged their limited options and have filed for Chapter 11 in order maximize value for their stakeholders by rejecting and/or renegotiating leases and completing their operational and balance sheet restructuring. The Prepetition Lenders have agreed to assist the Debtors in these efforts by committing additional funds to ensure that the Company continues to operate as a going concern while the assets of ARG Enterprises and ARG Property Management are once again exposed to the market for sale.

To that end, prior to the Petition Date, the Debtors and Pecus Main and Pecus Parallel (collectively, the "Purchasers") executed that certain Asset Purchase Agreement (the "Asset Purchase Agreement"), providing for the Purchasers to serve as stalking horse bidder for the sale of substantially all of the Debtors' operational assets. The Debtors intend to expeditiously implement an overbid process and complete a sale of their assets pursuant to Bankruptcy Code Section 363(b).

**PART II**

**FIRST DAY MOTIONS AND APPLICATIONS**

**I.    Motion For Order Directing Joint Administration.**

25.    The joint administration of the Debtors' chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest. The Debtors anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect all of the Debtors. Joint administration will permit counsel for all parties in interest to combine the Debtors' respective cases in a single caption on the numerous documents that will be filed and served in these cases. Joint administration will also enable parties in interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before the Court in every one of the Debtors' cases.

26.    Because these cases involve three (3) Debtors which have in excess of approximately 4200 creditors, the entry of an order of joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the relief requested by this Motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

27.     For these reasons, I believe that joint administration of these cases by the Court is in the best interests of the Debtors' estates.

## II.     Motion For Authority to Employ and Retain Kurtzman Carson Consultants LLC as Their Notice, Claims, and Balloting Agent.

28.     The size of the Debtors' creditor and interested party body makes it impracticable for the Debtors to, without assistance, undertake the task of sending notices to creditors and other parties-in-interest.   For ease of administration of their estates, the Debtors propose to engage Kurtzman Carson Consultants ("KCC") as their notice, claims and balloting agent.

29.     KCC is one of the nation's leading chapter 11 administrators, with extensive experience in noticing, claims processing, claims reconciliation and distribution, and balloting and vote tabulation.   KCC has substantial experience in the matters upon which it is to be engaged.   KCC has acted as official notice, claims and balloting agent in chapter 11 cases filed in Delaware and in many other jurisdictions.

30.     I believe that the Debtors' estates, and particularly their creditors, will benefit from KCC's significant experience in acting as a notice, claims and balloting agent in other cases, and the efficient and cost-effective methods that KCC has developed.

31.     I understand that KCC has the necessary staff and equipment to manage the volume of work involved in properly sending the required notices to and processing the claims and ballots of creditors and other interested parties in these cases.   I further understand that KCC will follow the notice, claim and balloting procedures that conform to the guidelines promulgated by the Clerk of the Bankruptcy Court and the Judicial Conference.   I believe that the most effective and efficient manner of noticing creditors and parties in interest in these cases, and administering the claims process, is for the Debtors to engage KCC as an independent third party to act as the Debtors' notice, claims and balloting agent.

32.     For these reasons, I believe that KCC should be retained as the Debtors' notice, claims and balloting agent in these cases.

### III.    Motion For an Order Authorizing Debtors to Maintain Existing Cash Management System and Granting Interim Waiver of Bankruptcy Code Section 345(b) Requirements.

33.     The Debtors currently operate, in the ordinary course of business, sixty-nine (69) restaurants in seven (7) states. The Debtors manage the finances of the Black Angus Restaurants through the maintenance of a centralized cash management system. Specifically, ARG Enterprises has eighty-five (85) accounts and subaccounts (the "Bank Accounts") at two banks: Wells Fargo Bank ("WFB") and First Hawaiian Bank ("FHB" together with WFB, the "Depository Banks").[7] The Bank Accounts are essential to the Debtors' ongoing operations and the disruption of their cash management system would be detrimental to the Debtors and their estates.

34.     I believe that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtors' business needs and operations. To require the Debtors to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates. Moreover, permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their business and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were not honored.

35.     Likewise, the commencement of these cases will already place a strain on the Debtors' relationships with their employees, customers and vendors, all of whom are vital to the

---

[7] Eight-four (84) of the bank accounts are maintained at WFB. A single "deposit only" account is maintained at FHB for the Debtors' Hawaii location.

Debtors' continued operations and successful reorganization. Requiring the Debtors to open all new Bank Accounts and to dishonor and reissue checks and drafts would not only cause delay, confusion and disruption in the Debtors' operations, it would also jeopardize Debtors' vital relationships with these parties in interests.

36.     The Debtors have filed, among other motions: (a) a motion seeking authority to pay certain outstanding employee obligations; (b) a motion seeking authorization to pay the prepetition claims of certain critical vendors; (c) a motion to enable them to satisfy their prepetition obligations relating to sales, use and similar taxes; and (d) a motion to enable them to continue to honor their prepetition customer practices. Accordingly, unless this Motion is granted, the Debtors undoubtedly would be unable to satisfy certain checks and be forced to reissue checks to the detriment of their business and without any benefit to the estate.

37.     Consequently, I believe that maintenance of the existing Bank Accounts and Cash Management System is in the best interests of all creditors, other parties-in-interest, and the Debtors' estates.

38.     The Debtors also request authorization to continue to use all letterhead, purchase order forms, invoice forms and any other business forms, including checks, as existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as chapter 11 debtors in possession. Changing correspondence and business forms would be unnecessary, expensive, burdensome, and disruptive to the Debtors' business operations. For these reasons, the Debtors request that they be authorized to continue using existing business forms without being required to place the label "Debtors in Possession" on each form.

39. The cost to the Debtors and their estates in obtaining new checks and other business forms would be significant and the Debtors have already taken other measures to ensure that the policies underlying the U.S. Trustee's operating guidelines are protected by generally alerting parties-in-interest to the Debtors' chapter 11 filings. Accordingly, I believe that the requested relief is necessary to preserve the Debtors' estates.

40. As discussed above and in the motion, all of the Debtors' Bank Accounts are ordinary depository accounts maintained for operational and not investment purposes. At times, the individual balance in the Cash Dominion Account and the Concentration Account may exceed the current limits of governmental insurance. Therefore, these accounts may be subject to the bonding or collateralization requirements of Bankruptcy Code Section 345(b) and the U.S. Trustee's Guidelines unless those requirements are waived.

41. I believe it would be in the best interests of the estates' creditors to continue following the existing deposit practices, notwithstanding the requirements of Bankruptcy Code Section 345(b) and the U.S. Trustee Guidelines. I further submit that the Debtors' deposit practices are commercially reasonable, appropriate and consistent with the intent of Bankruptcy Code Section 345.

42. For these reasons, I believe that authorizing the Debtors to maintain the existing Cash Management System, Bank Accounts, and Business Forms; and granting an interim waiver of the requirements contained in Bankruptcy Code Section 345(b) is in the best interest of the Debtors, their estates and creditors.

## IV.    Motion For Order Authorizing the Payment of Prepetition Sales and Use Taxes.

43.    I understand that, to the extent the Debtors have collected sales and use taxes from their customers, such funds may constitute so-called "trust fund" taxes (the "Trust Fund Taxes") that were required to be collected from third parties and must be held in trust by the Debtors for payment to the Taxing Authorities.

44.    In addition, I understand that many state and local Taxing Authorities impose personal liability on the officers and directors of entities responsible for collecting Trust Fund Taxes to the extent that any such taxes are collected but not remitted.  Thus, if any Trust Fund Taxes remain unpaid, the Debtors' officers and directors may be subject to lawsuits or even criminal prosecution on account of any such nonpayment during the pendency of these cases. Such lawsuits or proceedings obviously would constitute a significant distraction for officers and directors at a time when they should be focused on the Debtors' efforts to: (a) stabilize the Debtors' postpetition business operations; and (b) develop and implement a successful Chapter 11 strategy.

45.    Moreover, I believe that some of the Taxing Authorities may seek to have the Debtors audited if the Trust Fund Taxes are not paid promptly.  I believe such audits would further divert attention and resources from the reorganization process.

46.    I submit that the payment of the Trust Fund Taxes is necessary to preserve the assets of the Debtors' estates and to maintain their ongoing operations.

47.    For these reasons, I believe that authorizing the Debtors to pay the prepetition sales, use and other taxes is in the best interests of the Debtors, and their estates and creditors.

**V.  Motion For an Order Authorizing Payment of Certain Prepetition Employee Obligations and Honoring of Prepetition Employee Policies and Benefits**

48.  Prior to the Petition Date and in the ordinary course of their business, the Debtors provided their employees with wages, salaries, incentive compensation, vacation time, and other compensation and benefits as further described herein (the "Employee Obligations").

### The Debtors' Employee Programs

49.  The Debtors employ more than 3600 individuals (collectively, the "Employees"), including: (a) approximately 3,340 hourly employees who work in the Black Angus Restaurants (the "Restaurant Staff"); (b) approximately 250 salaried employees that work as managers and chefs in the Black Angus Restaurants ("Restaurant Management"); (c) approximately 5 hourly employees who work in corporate administration ("Corporate Staff"); and (d) approximately 40 salaried employees who work in corporate administration and management ("Corporate Management").

**A.  Employee Compensation**

50.  The Debtors' Employees are either paid on an hourly or salary basis.  The Employees are paid in arrears every other Monday, with payments staggered between Restaurant Staff and Restaurant Management, Corporate Staff and Corporate Management.  The Debtors pay their Employees either through direct deposit or by checks drawn on a disbursement account maintained by the Debtors.

**i.  Payroll**

51.  InfoSync Services, LLC ("InfoSync"), a third-party payroll administrator, processes the Debtors' weekly payroll, based upon data transmitted to it from the Debtors'

restaurants and corporate headquarters. [8] InfoSync tallies the amounts necessary to fund payroll (including payroll taxes) and requests that the Debtors transmit the necessary amounts to the applicable disbursement account. Upon approval of the payroll distribution by the Debtors, InfoSync prepares and electronically signs the payroll checks drawn on, and facilitates the Debtors' direct deposits from, one of the Debtors' disbursement accounts. [9]

52.     The Restaurant Staff's last pay day was January 12, 2009 for the period December 23, 2008 through and including January 5, 2009. As of the Petition Date, the Restaurant Staff is owed approximately $530,000 for work performed prior to the Petition Date.

53.     The Restaurant Management, Corporate Management and Corporate Staff's last pay day was January 5, 2009, for the period December 22, 2008 through and including January 4, 2009. As of the Petition Date the Restaurant Management, Corporate Management and Corporate Staff were owed approximately $390,000 for work performed prior to the Petition Date.

54.     Additionally, given the proximity of the Petition Date to the last payroll and the nature of the Debtors' business, the Debtors' estimate that approximately $787,000 in outstanding payroll has not cleared as of the Petition Date.

55.     Accordingly, the Debtors owe their Employees approximately $1.7 million in accrued prepetition wages and salary as of the Petition Date, including an estimate of payroll checks that were delivered prepetition but have not cleared as of the Petition Date. Only one of the Debtors' employees is owed more than $10,950 in accrued and unpaid wages or salary. This

---

[8] InfoSync provides other services to the Debtors in addition to payroll services. The Debtors believe that they are current on their outstanding obligations to InfoSync.
[9] As an additional control, payroll checks of $4,000 or more must receive a second live signature from an authorized representative of the Debtors.

employee is a California Employee (as defined below). All of the outstanding wages and salary were earned within 180 days of the Petition Date.

56.     In addition, as of the Petition Date the Debtors owe an estimated $230,000 to government agencies with respect to the above prepetition wages and salary in unremitted payroll-related withholding obligations and taxes (including income tax withholding, medicare, social security, unemployment taxes and the like) (the "Withholding Obligations").

### ii.     Incentive Compensation

57.     In addition to their salaries, restaurant managers and district managers receive certain incentive compensation based on performance of their restaurants and districts, respectively. The management team (i.e., general managers, managers, chefs and sous chefs) at each of the Black Angus Restaurants is entitled to participate in up to 0.7% of their restaurant's monthly revenues, if the restaurant achieves specified sales and profitability targets ("Management Incentive Compensation"). Each district manager is entitled to earn up to 0.112% of the revenues generated by the restaurants in his or her district, if the restaurants in that district achieve certain performance targets ("District Incentive Compensation").

58.     A portion of the Management Incentive Compensation and District Incentive Compensation (collectively, "Incentive Compensation") is paid monthly, approximately eight to ten weeks following the conclusion of the month for which the compensation has been earned. The remainder is paid quarterly.

59.     The Debtors have not calculated the Incentive Compensation for the last quarter of 2008. The Debtors also have some outstanding obligations for the third quarter of 2008. The Debtors estimate that as of the Petition Date, an estimated $205,000 in Incentive Compensation may have been earned, and has not yet been paid.

60. None of the Debtors' Employees entitled to receive a bonus under the Incentive Compensation is entitled to more than $10,950, including both wages or salary, and Incentive Compensation. All of Incentive Compensation owed to employees was earned within 180 days of the Petition Date.

**B.     Personal Time Off**

61. Restaurant Management, Corporate Management and Corporate Staff are eligible for personal time off ("PTO") to be used at the Employee's discretion for vacation, shopping, personal appointments, sickness or any other reason. With respect to the Debtors' Employees working in California (the "California Employees"), state labor law requires the Debtors to pay all such vested and unused PTO as wages to the California Employees "at [their] final rate in accordance with such contract of employment or employer policy respecting eligibility or time served." See California Labor Code §227.3 (2008). The same is true whether the employee is discharged or quits. See California Labor Code §§ 201, 202.

62. PTO is awarded based on length of service and does not accrue while an Employee is on any unpaid leave or disability leave. Employees must work at least thirty (30) hours per week to earn PTO and PTO will not exceed twenty (20) days a year.

63. As of the Petition Date, the Debtors' Employees collectively have accumulated approximately $750,000 in PTO. The Debtors intend to honor accrued PTO days in the ordinary course of business. None of the Debtors' Employees shall receive an aggregate amount in excess of the statutory cap of $10,950 under Bankruptcy Code Section 507(a)(4) on account of PTO, wages, salary and Incentive Compensation, except that solely with respect to California

Employees, the Debtors request authority to pay such obligations in excess of the statutory cap to the extent such payments are required to comply with California state law.[10]

## C.  Employee Benefits

64.  As part of the Employee's compensation package, the Company offers various employee benefits and policies that provide their employees with medical, dental, workers' compensation, life insurance and other benefits (collectively, the "Employee Benefits"). The Employee Benefits may be conditioned upon the Employee's hire date or length of service. Some benefits are self-insured and/or funded directly by the Company. In addition, certain third-party administrators have been engaged to assist with these programs. Insurance companies and other benefit providers, also pursuant to prepetition contracts, provide other benefits.

### i.  Medical Benefits

65.  The Debtors offer medical benefits (including, where applicable, prescription, dental, and vision benefits) to employees under three different plans (the "Medical Plans"), depending upon the category of employee. Each of these plans is described below.

#### a.  Self-Insured Medical Plan

66.  The Debtors provide medical benefits to Corporate Management, Corporate Staff, Restaurant Management, and their respective families through a program under which the Debtors pay eligible medical and dental claims directly ("Self-Insured Medical Plan"). Employees working 30 hours or more per week are eligible to participate in the Self-Insured Medical Plan. Participating employees contribute a fixed amount each month through payroll deductions to defray the costs of the program.

---

[10] The Debtors' sick day policy for Corporate Management covers occasional absences for illness, but sick days are not accrued.

67. Benefit & Risk Management Services, Inc. ("BRMS") administers the program on behalf of the Debtors for a monthly fee. The Debtors maintain stop-loss insurance coverage through Optimum Health Specialty Benefits ("Optimum"), in respect of claims exceeding $125,000. The Debtors pay a monthly premium for this stop-loss coverage.

68. Employees or their service providers submit claims to BRMS. BRMS then reviews and processes those claims. Claims exceeding $125,000 are submitted to Optimum. For all other claims, BRMS provides the Debtors a report listing the claims that have been approved for payment by BRMS and the checks that it proposes to issue in respect of those claims. Upon the Debtors' approval, BRMS prepares checks drawn on the Debtors' disbursement account, electronically signs them on behalf of the Debtors, and dispatches those checks to the appropriate payees.[11]

69. Based on recent claims history, the Debtors estimate that, as of the Petition Date, there are approximately $283,000 in eligible claims that have been incurred but not submitted, processed, or paid under the Self-Insured Medical Plan, or as to which checks have been issued but have not yet cleared. The employees that received the medical services in respect of these claims will be responsible for paying these claims if they are not paid by the Debtors.[12]

**b. Restaurant Staff Plan**

70. The Debtors offer Restaurant Staff a limited benefit sickness and accident plan under an insurance policy provided by Connecticut General Life Insurance Company under their Starbridge program ("Restaurant Staff Plan"). It is funded solely by payroll deductions of participating Restaurant Staff. The Debtors remit the deducted premiums to the insurance

---

[11] As an additional control, checks of $9,000 or more must receive a second live signature from an authorized representative of the Debtors.
[12] The Debtors also provide a prescription benefit to Corporate Management and Corporate Staff through Tricast, Inc. for a monthly fee.

company on a biweekly basis. As of the Petition Date, the Debtors have made approximately $65,000 in payroll deductions in respect of this insurance policy that have not yet been remitted.

### c. Hawaii Medical Plan

71.     The State of Hawaii requires that companies doing business in Hawaii provide health-care insurance coverage for eligible employees located in Hawaii. The Debtors maintain that premium-based coverage through the Hawaii Medical Service Association ("HMSA"). The Debtors' Hawaiian Employees contribute to the health-care insurance premiums through payroll deductions, and the Debtors pay the balance. As of the Petition Date, the Debtors have not collected any payroll deductions in respect of this coverage that have not yet been remitted.

### ii.     Disability Insurance

72.     The Debtors provide short-term disability insurance under two programs. Each of those plans is described below.

### a. Self-Insured Disability Plan

73.     The Debtors provide short-term disability insurance to all Corporate Management, all Corporate Staff, and those Restaurant Staff located in California ("Self-Insured Disability Plan"). Employees in California contribute to the Self-Insured Disability Plan through payroll deductions at a rate established by the California Employment Development Department. The Debtors fund the cost of the Self-Insured Disability Plan for all other eligible Employees.

74.     The Self-Insured Disability Plan is administered by Voluntary Plan Administrators ("VPA"). After approved claims have been processed, they are paid with checks drawn on a VPA account. Each week the Debtors remit to VPA the total amount necessary to fund the week's anticipated check presentment.

75.     The Debtors estimate, based on their recent claims history, that as of the Petition Date there are approximately $81,000 in eligible disability claims that have been incurred by

employees that have not been submitted, processed, or paid under the Self-Insured Disability Plan, or as to which checks have been issued but not yet cleared.

### b. Hawaii Disability Plan

76.     The State of Hawaii requires the Debtors to provide short-term disability coverage for all eligible employees working in Hawaii. The Debtors and the Hawaii employees each pay half the cost of the plan. The Debtors obtain this coverage through Hartford Life Insurance in Hawaii pursuant to a prepetition insurance contract.

### iii.     Accidental Death or Dismemberment/Life Insurance

77.     The Debtors provide Corporate Management and Corporate Staff an accidental death and dismemberment insurance benefit equal to twice the Employee's salary, up to $100,000, and a life insurance benefit equal in amount to the Employee's salary, up to $50,000. Unimerica provides this coverage under a prepetition insurance program contract.

78.     Eligible employees also can purchase additional life insurance, accidental death and dismemberment insurance, and long-term disability insurance through Unimerica. The premium is funded through payroll deductions. As of the Petition Date, the Debtors have made approximately $59,000 in payroll deductions for such coverage that have not yet been remitted.

### iv.     Workers' Compensation

79.     Over the years, the Debtors have maintained a variety of self-funded workers' compensation plans to provide benefits to Employees (other than those in the State of Washington) in the event of a work-related long-term disability.[13]   These programs are administered by a third-party administrator. The Debtors' obligations to Employees are insured under policies issued by insurance companies, and these policies are secured by letters of credit.

---

[13] Washington employees are covered by Washington's state-run workers' compensation plan, to which the Debtors make quarterly payments in advance.

80.     Gallagher Bassett Services, Inc. ("Gallagher") administers the Debtors' current program on behalf of the Debtors for a monthly fee. The Debtors' obligations to workers' compensation claimants are insured under a policy with Federal Insurance/Chubb, which includes stop loss coverage in respect of individual claims exceeding $500,000.

81.     As of the Petition Date, the Debtors estimate based on their claims history that there are approximately $1.4 million in accrued unpaid workers' compensation claims under their existing and legacy workers compensation programs. Letters of credit, in excess of $4.1 million, secure payment of these claims.

82.     The Debtors intend, going forward, to allow outstanding workers' compensation claims to be funded through the outstanding letters of credit, rather than continuing to pay those claims directly. Nevertheless, in an abundance of caution, the Debtors are seeking authority, in their discretion and as they deem advisable, to honor and pay workers' compensation claims in the ordinary course of business.

### v.     401(k) Plan

83.     The Debtors offer a 401(k) plan to employees that satisfy the plan's qualification requirements. Pursuant to this plan, payroll deductions are made from plan participants' pay and forwarded by the Debtors to the appropriate plan trustee. These funds typically are remitted by the Debtors two to four weeks after each payroll; after the Company and the 401(k) administrator review and reconcile the information regarding each payroll. As of the Petition Date, approximately $39,000 in prepetition payroll deductions have been made by the Debtors from the 401(k) plan participants, which have not yet been remitted to the plan trustee. The Debtors seek authority to remit these payroll deductions to the plan trustee.

### vi.    Business Reimbursement

84.    The Debtors reimburse certain of their personnel for business and travel expenses. These expenses typically result from travel between the Debtors' corporate offices and business meetings. Employees usually pay these expenses out of pocket and subsequently seek reimbursement from the Debtors.

85.    As of the Petition Date, an estimated $40,000 in reimbursable business and travel expenses had been incurred but had not been submitted for reimbursement or paid. Failure to reimburse these expenses would impose an undue burden on the affected employees, who incurred those expenses with the expectation that they would be reimbursed. No more than approximately $5,750 of this amount is estimated to be owing to insiders of the Debtors.

86.    The Debtors employ over 3,600 individuals. These Employees may suffer extreme hardship if the Employee Obligations are not honored and may be unable to pay their basic living expenses, causing serious harm to the Employees' families. Moreover, I am concerned that if their employees are not paid their outstanding wages, morale will suffer and Employees may decide to leave at this critical time.

87.    I do not anticipate that the postpetition payment of Employee Obligations will create any significant, ongoing burden on the Debtors' estates. I believe the Debtors will have sufficient cash on hand to pay all Employee Obligations.

88.    There are twelve (12) California Employees whose payments under this motion potentially could exceed the statutory cap, but only to the extent Debtors are required to make cash payments upon their termination as required under California Law. Only one California Employee exceeds the statutory cap for unpaid wages, in addition to other obligations owed, including PTO. The maximum aggregate amount that could potentially exceed the statutory cap is approximately $69,000.

89.     For the foregoing reasons, I submit that granting the relief requested herein is appropriate and in the best interests of the Debtors' estates.

## VI.     Motion For Interim and Final Orders (I) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service; (II) Deeming Utilities Adequately Assured of Future Performance; and (III) Establishing Procedures for Determining Adequate Assurance of Payment.

90.     The Debtors, in the ordinary course of business, pay expenses for utility services (the "Utility Services") from various companies (the "Utility Providers"). The Utility Services are essential to the Debtors' operations and, therefore, must continue uninterrupted during the pendency of these cases.

91.     If the Utility Providers are permitted to alter, refuse or terminate utility services, even for a brief period, a substantial disruption of the Debtors' operations will occur, and the Debtors' businesses will be harmed, possibly severely. I believe such a disruption could have a devastating impact on the Debtors' business operations and revenues, and ultimately affect the Debtors' ability to maximize the value of their estates. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition charges. It is therefore critical that Utility Providers continue to provide uninterrupted utility services to the Debtors.

92.     I submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for the future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.

## VII.     Motion For Order Authorizing Debtors to Honor Gift Cards and Customer Coupons in the Ordinary Course of Business.

93.     In the ordinary course of the Debtors' business, the Debtors have implemented a number of programs to induce customers to dine at the Black Angus Restaurants. Specifically,

the Debtors routinely circulate coupons and sell electronic prepaid gift cards (the "Gift Cards"). These programs are collectively referred to herein as the "Customer Programs."

94.    The Gift Cards can be purchased at the Black Angus Restaurants and at headquarters. The Gift Cards sold within the Black Angus Restaurants and headquarters are administered by Paymentech, LLC and JPMorgan Chase Bank, N.A. (collectively, "Chase Paymentech"). Chase Paymentech receives a transaction fee for each Gift Card that is activated (the "Chase Paymentech Fees"). The Debtors also have issued a letter of credit in favor of Chase Paymentech in the amount of $7.5 million to secure obligations for the Gift Cards. For example, if a customer purchased a Gift Card with a credit card, and the Debtors fail to honor the Gift Card or the customer otherwise determines the transaction should be voided, the customer can seek to reverse the charge with its credit card company. That credit card company in turn will charge the amount of the Gift Card back to Chase Paymentech. The letter of credit permits Paymentech to withdraw funds based on these chargebacks.

95.    In addition, the Debtors have entered into an exclusive contract with Blackhawk Marketing Services, Inc. ("Blackhawk"), an affiliate of Safeway, Inc. Pursuant to the agreement, Blackhawk sells the Debtors' Gift Cards at Safeway grocery stores and a number of other third-party retail merchants. When Gift Cards are activated, Blackhawk reconciles them on a weekly basis and submits a percentage of the face value of the Gift Card to the Debtors, refacing a fee for each Gift Card sold (the "Black Hawk Fees", together with the Chase Paymentech Fees, the "Outstanding Obligations"). The Debtors believe they are current on all Outstanding Obligations.

96.     The Debtors' Gift Card program has been successful.  The historical annual Gift Card sales are approximately $13-15 million, with 45% of the revenue being generated during the December holiday season.

97.     As of the Petition Date, the Debtors estimate that the outstanding Gift Card obligations are approximately $15.2 million.   However, based on historic experience, approximately $1.2 million of this amount will not be redeemed.

98.     In addition, in the ordinary course of the Debtors' business, on a bi-weekly basis, the Debtors distribute customer coupons through local newspapers or periodicals and direct mailings to residents located in the Black Angus Restaurant markets.  Each distribution will typically contain three coupons – two for dinner and one for lunch – and will generally expire three to four weeks from the distribution date.  Although the Debtors distribute numerous coupons, the actual redemption of coupons is rather small, less than 1% of coupons distributed.  Aside from the obvious incentives the coupons present to their customers, the coupon program is a cost-effective method of advertising the Debtors' business.  Based on recent experience, the Debtors' coupon programs have generated as much as $861,000 in revenue per week, net of the discounts provided thereunder.

99.     The restaurant industry is highly competitive.  I believe that if the Debtors fail to honor their obligations under their Customer Programs, the Debtors will suffer irreparable harm through the loss of customers and valuable business.  Most of the Gift Card sales are made to repeat customers and the failure to honor such Gift Cards will also result in the loss of new gift card sales. Accordingly, if the Debtors fail to maintain and honor these Customer Programs, there will be a material adverse impact on the Debtors' ability to maintain existing customers and attract new ones.

100.    In addition, if the Debtors fail to pay the Outstanding Obligations, Chase Paymentech and Blackhawk may cease providing their necessary services relating to the Gift Cards.

101.    In my opinion, it is critical to the Debtors' estates that they maintain their Customer Programs and pay the Outstanding Obligations.  The Debtors are dependent on their customers for all revenue and I believe that maintaining and continuing the Customer Programs is necessary to their operations.

102.    I believe that authorizing the Debtors to maintain their Customer Programs and pay the Outstanding Obligations is in the best interest of the Debtors, their estates and creditors.

**VIII.    Motion For Order Authorizing the Payment of Certain Prepetition Claims of Critical Vendors in the Ordinary Course of Business.**

103.    Twelve percent 12% of the Debtors' gross sales at the Black Angus Restaurants relate to the sale of various liquor, beer, wine and other alcohol-related products (collectively, the "Liquor").  I believe that even a temporary loss of the ability to obtain and sell Liquor will result in the loss of customers and revenue.  Most of the Liquor supplied to the Black Angus Restaurants is provided by certain vendors who have exclusive territorial distribution rights where the Black Angus Restaurants are located (the "Critical Vendors").  Accordingly, the Debtors must be able to pay the Critical Vendors if the Debtors expect to maintain normal operations and to prevent the loss of valuable customers and revenue.

104.    As of the Petition Date, approximately 145 Critical Vendors are owed approximately $300,000 (collectively, the "Vendor Claims").  Substantially all of Critical Vendors provide goods on 21-day terms; thus nearly one hundred percent (100%) of these Vendor Claims were incurred within twenty (20) days prior to the Petition Date in the Debtors' ordinary course of business.

105. It is critical that the Debtors receive the goods supplied by the Critical Vendors. I believe that any such loss will have a negative impact on the Debtors' revenue and customer good will. Thus, I represent that the relief requested in this motion is necessary to preserve the assets of the Debtors' estates and to maintain their ongoing operations.

**IX. Motion For Interim and Final Orders (A) Authorizing the Debtors to (i) Obtain Postpetition Financing Pursuant to Bankruptcy Code Sections 105, 361, 362, 364, and Bankruptcy Rules 2002, 4001, 9014; and (ii) Utilize Cash Collateral Pursuant to Bankruptcy Code Section 363; (B) Granting Adequate Protection to Prepetition Secured Parties; and (C) Scheduling a Final Hearing.**

**A. Debtors' Need for Financing**

106. The Debtors have filed contemporaneously herewith a motion for an order scheduling a hearing to approve, among other things, the sale of substantially all of the Debtors' assets (the "Sale Motion"). As further set forth in the Sale Motion and the First Day Declaration, the Debtors do not have sufficient working capital, or other assets that are not subject to the Prepetition Lenders' liens, to continue their business operations without the need for additional financing. Therefore, the Debtors have engaged in an extensive marketing of their assets, as described above, to potential third-party purchasers. As previously stated, the Purchasers will serve as the proposed stalking horse as the Debtors seek to sell substantially all of their assets pursuant to an orderly sale process approved by this Court (the "Sale").

107. The DIP Facility (defined below) is crucial to maximize the value of the Debtors' estates and distributions to creditors. As of the Petition Date, the Debtors had approximately $107,000 in cash to meet its various business expenses -- all of these funds are encumbered by the liens of the Prepetition Lenders. Therefore, the Debtors do not have sufficient unencumbered funds available to pay their employees and maintain operations in the ordinary course of business. Without use of cash collateral and access to the working capital available under the DIP Facility, the Debtors would be forced to cease operations and terminate all of their

employees.  This would cause the Debtors' estates to suffer irreparable harm in the form of lost business, damage to reputation and the inability to maximize the value of their assets through sale as a going concern.

108.    The Debtors' attempts to obtain financing under terms different than those proposed in the motion have been unsuccessful.  As such, the DIP Facility is the only viable source of financing available to the Debtors.  Prior to the Petition Date, I sough proposals from a variety of potential lenders.  In light of the existing liens asserted by the Prepetition Lenders, the lack of collateral to secure a loan, and the state of the Debtors' business and financial situation, I was unable to obtain post-petition financing from a source other than the Prepetition Lenders.

109.    The Debtors negotiated the terms of the proposed postpetition financing (the "DIP Facility") in good faith and at arm's length and the Debtors believe the terms of the DIP Facility are fair and reasonable.    These negotiations culminated in an agreement by the Prepetition Lenders (in their capacity as lenders under the DIP Credit Agreement, as defined below, the "DIP Lenders") to provide up to $71.5 million in postpetition financing.  Accordingly, subject to this Court's approval, the Debtors have entered into that certain Post-Petition Senior Secured Super-Priority Credit Agreement (the "DIP Credit Agreement").  The DIP Credit Agreement is attached to the motion as Exhibit "1."

110.    For these reasons, I believe that the best terms available are those proposed in the DIP Credit Agreement.

**B.      Summary of the Terms of the Proposed DIP Credit Agreement**

111.    The DIP Credit Agreement provides financing in an amount sufficient to fund the budget (the "Budget"), which is attached to the DIP Credit Agreement as Exhibit D-1.  The motion sets forth a summary of certain significant terms and conditions of the DIP Credit Agreement, and I believe that summary to be accurate.

**C.      Debtors' Need for Cash to Fund Business Operations**

112.    The Debtors anticipate needing approximately $4.8 million in new money to continue operating as a going concern through the time necessary to close the Sale and to maximize value to creditors.  In the first three weeks of the case, the Debtors anticipate needing approximately $2.3 million to fund operations.

113.    The Debtors spend several million dollars in the aggregate each week to purchase food, liquor and supplies, compensate their employees and provide employee benefits, pay rent on their leased premises, pay promotional expenses, service and maintain their leased premises, and satisfy utility costs.  The Debtors do not realize revenues from their operations until they actually serve their customers meals and receive payment from them, or in the case of credit card sales, from credit card companies.

114.    Therefore, the Debtors require use of cash collateral and a revolving, working capital line of credit to operate.  Without the necessary funds to purchase food inventory and meet their other expenses, the Debtors' operations will suffer and the value of the Debtors' businesses will be diminished.  Millions of dollars in perishable inventory likely will be lost, and over 3,635 employees will be at risk of losing employment.  If the Debtors are forced to terminate operations or even delay operations, it will cause immediate and irreparable harm to the Debtors' going concern value.

115.    Thus, the Debtors need for approval of the DIP Credit Agreement and use of cash collateral is critical and immediate.  With these circumstances in mind, the Debtors have negotiated with the DIP Lenders to obtain the DIP Facility and with the Prepetition Lenders for the use of cash collateral.  This will allow the Debtors to continue operating while they pursue a sale and overbid process in chapter 11.

116.     As of the Petition Date, the Debtors had almost no available cash to fund their operations, other than a minimal amount of cash trapped in their cash management system. Pursuant to the Prepetition Credit Facility, the Prepetition Lenders sweep the Debtors' accounts on an almost daily basis. The Debtors do hold cash, sometimes ranging in excess of $250,000, in their Cash Dominion Account and Concentration Account. The Prepetition Lenders assert liens on all of this cash and will not permit use of cash collateral except as provided for in the proposed Interim Order.

117.     The Debtors require emergency interim approval of the DIP Facility. The Debtors anticipate that they will require more than $11.0 million in cash to operate over the next three weeks. During that three-week period, among other costs, the Debtors will need to pay for the following: food and liquor (approximately $3.0 million); payroll and benefit obligations (approximately $2.7 million); rent, lease payments and utilities (approximately $1.8 million); taxes (approximately $1.2 million) and marketing (approximately $120,00). The Debtors will also need to satisfy costs arising out of the closing of the DIP Credit Agreement, and pay restructuring costs to be incurred over this time frame.

118.     The Debtors' projections show that the Debtors require not only the use of the cash that the Debtors anticipate generating during that period, but additional capital from a revolving credit facility.[14] Without that capital, the Debtors simply will not be able to meet the costs of operation. Therefore, the Debtors seek authority on an interim basis to use the cash generated from the operation of their business and borrow up to $12.0 million under the DIP Facility, pending final approval.

---

[14] Becaue the DIP Facility requires the Debtors to repay prepetition obligations daily to the extent of cash receipts, the Debtors must borrow daily under the DIP Facility in an amount equal to daily cash receipts to ensure adequate case on hand to fund operations.

**D.** **Basis for the Requested DIP Facility**

119.    The Debtors are unable to continue operating using only Cash Collateral pending a sale process for the disposition of their assets. Without financing as provided by the DIP Credit Agreement, the Debtors lack the ability to pay expenses essential to operations, including salaries, wages, lease payments, utilities and asset maintenance. Thus, the DIP Facility is necessary for the Debtors to operate in the ordinary course of business pending a going concern sale, which, in turn, will maximize any potential recovery to creditors.

120.    In order for the Debtors to continue as a going concern, they must have access to the DIP Facility. The Debtors have attempted but have not been able to obtain postpetition financing on an unsecured basis, pursuant to Bankruptcy Code Sections 364(a) or (b). Similarly, the Debtors have attempted but have not been able to obtain postpetition financing under Bankruptcy Code Section 364(c), other than the DIP Facility which is secured by liens granted pursuant to Bankruptcy Code Section 364.

121.    The Prepetition Lenders have consented to the terms of the DIP Facility and DIP Credit Agreement, the grant of a super-priority claim to the DIP Lenders, and the priority of the liens granted to the DIP Lenders under the DIP Credit Agreement. Thus, while the Prepetition Lenders' liens are being primed, the Prepetition Lenders have consented to being primed and there can be no dispute that the Prepetition Lenders are adequately protected.

122.    The Debtors believe that the terms of the DIP Credit Agreement are fair and reasonable. The financing provided under the DIP Credit Agreement is necessary to enable the Debtors to operate in the ordinary course of business until the Sale process is completed. Thus, the Debtors will continue to operate and develop their business in an effort to maximize recoveries for creditors of their estates. The DIP Facility will further assure the continued support of the Debtors' creditors and suppliers, postpetition. The terms of the DIP Facility are

also consistent with market rates and are reasonable under the facts and circumstances of these cases.

### E. Protections Under Bankruptcy Code Section 364(e)

123. The Debtors believe that the terms and conditions of the DIP Credit Agreement are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's length with all parties represented by experienced counsel. Accordingly, the Prepetition Lenders should be provided with the benefit and protection of Bankruptcy Code Section 364(e), such that if any of the provisions of the DIP Credit Agreement are later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the Prepetition Lenders will be fully protected with respect to any amounts previously disbursed.

### F. Basis for the Debtors' Use of Cash Collateral

124. The Court should authorize the Debtors' immediate use of Cash Collateral in order to preserve the value of the Debtors' assets. The Debtors have worked diligently with the Prepetition and DIP Lenders to prepare a Budget. The Budget demonstrates that through the use of Cash Collateral and DIP Facility, the Debtors will be able to continue operations and maintain their going concern value. The Debtors' use of cash collateral will not harm the Prepetition Lenders' position because such use of cash collateral will allow the Debtors to continue operating and working towards a successful Sale and satisfaction of the Prepetition Obligations.

### X. Motion To Establish Procedures For Interim Compensation and Reimbursement of Expenses for Professionals.

125. Simultaneously with the filing of this Declaration, the Debtors filed an application to retain Landis Rath & Cobb LLP as their counsel.

126. The Debtors anticipate that, as these cases progress, they may need to retain other professionals in connection with their reorganization efforts. In addition, a statutory committee

of unsecured creditors (the "Committee") may be appointed in these cases. If appointed, the Committee will likely retain counsel, and possibly other professionals, to assist it in fulfilling its obligations in these cases.

127. The proposed compensation procedures outlined in this motion should enable professionals to be paid partial amounts owed to them while ensuring appropriate oversight, and otherwise not unduly burdening the Court, the United States Trustee and the respective Professionals. Accordingly, I submit that approving the compensation procedures is in the best interests of the Debtors' estates, creditors and other parties-in-interest.

**XI.     Motion for Order Authorizing the Debtors to (1) Reject <u>Nunc</u> <u>Pro</u> <u>Tunc</u> Certain Executory Contracts and Unexpired Non-Residential Real Property Leases and Subleases Primarily Related to Closed Restaurant Locations, and (2) Abandon any Property that Remains.**

128. Prior to the Petition Date, the Debtors either closed or never opened various unprofitable Restaurants and have vacated the premises and left them in broom-swept condition, including the locations specified in this motion (the "Non-Operating Locations").

129. Following the closure, the Debtors attempted to locate a third party willing to accept an assignment of the unexpired leases relating to the Non-Operating Locations. The Debtors engaged a real estate firm specializing in marketing closed retail locations to assist in marketing these leases. These efforts largely were unsuccessful.

130. Based on the unlikely realization of value, the cost of continuing to market the Rejected Leases and the administrative costs of maintaining the Non-Operating Locations, the Debtors determined that the Rejected Leases hold no value to the Debtors and their estates. In order to avoid further administrative expense to the estates, I believe it is the Debtors' sound business judgment to reject the Rejected Leases.

131. Through its restructuring efforts, the Company has also determined that a number of executory contracts (the "Rejected Contracts") are no longer necessary for the Debtors' ongoing operations.

132. To avoid paying unnecessary administrative expenses related to the Rejected Leases and Rejected Contracts, the Debtors are seeking to reject effective as of the Petition Date. I believe that the Rejected Leases and Rejected Contracts are not necessary and, hence, represent an undue burden on the Debtors' estate. Most of the Non-Operating Locations have been closed for several months and would drain necessary cash flow from the Debtors if the Rejected Leases are not rejected as of the Petition Date. Likewise, I believe that the Rejected Contracts provide no benefit to the Debtors' estates. Moreover, I believe that the Rejected Leases and Rejected Contracts have no market value and cannot be assigned to a third party for value. Accordingly, rejection of the Rejected Leases and Rejected Contracts is in the best interest of the Debtors, their estates and creditors.

133. The Debtors have done or will do all that is required for rejection of the Rejected Leases and Rejected Contracts nunc pro tunc as of the Petition Date. Specifically, service of this motion is an unequivocal expression of the Debtors' intention to reject the Rejected Leases and Rejected Contracts. Furthermore, the Debtors: (a) already have vacated the premises and returned the keys when appropriate to the respective landlords of certain Non-Operating Locations; (b) have served notice of this Motion by overnight mail on all of counterparties to the Rejected Leases and Rejected Contracts on the date hereof; and (c) will not withdraw any of the Rejected Leases from this Motion absent the consent of the respective counterparty. Finally, a Committee will likely be appointed and retain counsel prior to the hearing on this Motion, and,

therefore, will have an opportunity to voice any concerns with, or opposition to, the relief requested herein.

134.    While I believe the Debtors have removed all personal property of more than *de minimis* value from the Non-Operating Locations, to the extent that the Debtors have left any property, including, but not limited to, personal property, furniture, fixtures and/or equipment (collectively, "Personal Property") at the Non-Operating Locations, the Debtors also request that such Personal Property be deemed abandoned pursuant to Bankruptcy Code Section 554.

135.    I submit that any Personal Property remaining in the Non-Operating Locations will be of inconsequential value or burdensome to the Debtors' estates to remove. I believe that the cost of retrieving, marketing and reselling the abandoned Personal Property far outweigh any recovery the Debtors could hope to attain for the Personal Property. Accordingly, I believe that the abandonment of any such Personal Property is in the best interests of the Debtors, their estates and creditors.

136.    For the foregoing reasons, I believe this motion should be granted.

## XII.    Motion For Authority to Pay Prepetition Claims Under Perishable Agricultural Commodities Act and State Statutes of Similar Effect.

137.    Prior to the Petition Date, certain of the Debtors' vendors provided goods to the Debtors that constitute either (i) "perishable agricultural commodities"[15] as defined in the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499 (a), *et seq.* ("PACA") or (ii) any other eligible goods under state statutes of similar effect (collectively, the "PACA Goods").[16]

---

[15] The term "perishable agricultural commodities" has been defined generally as fresh "fruits and vegetables of every kind and character." See In re L. Natural Foods Corp., 199 B.R. 882, 885 (Bankr. E.D. Pa. 1996).

[16] Some states have enacted statutes granting protection similar to that of PACA. See, e.g., Minn. Stat. § 27.01, et seq. Accordingly, references to PACA, PACA Goods, PACA Claims and PACA Claimants in this Motion are also intended to refer to those state statutes and the goods, claims and claimants protected by those statutes. The relief requested in the Motion with respect to PACA Goods, PACA Claims and PACA Claimants is also requested with

138.    I understand that PACA provides generally for the automatic creation of a non-segregated floating trust on PACA Goods and proceeds for the benefit of the suppliers of PACA Goods until the buyer of the PACA Goods has paid for them in full.  I believe that many of their vendors of PACA Goods (collectively, the "PACA Claimants") will file claims against Debtors under PACA or state statutes of similar effect (the "PACA Claims") if their pre-petition claims are not paid in full.  The Debtors estimate the PACA Claims to be approximately $275,000.

139.    I believe it is essential to the Debtors' ongoing operations that the flow of fresh produce and other PACA Goods continue unimpeded.[17]  If the Debtors are not permitted to pay the PACA Claims, I believe it will have a substantial negative impact on the Debtors' ongoing value.

140.    I also believe that failure to authorize the relief requested in this Motion could potentially subject the Debtors to numerous adversary proceedings by PACA Claimants seeking to enforce their PACA Claims.  Further, I have been advised that under certain circumstances the Debtors' officers and directors could potentially be held secondarily liable for PACA Claims.  I believe that these suits, in addition to the likely disruption of the supply of fresh produce, would consume valuable estate assets, as well as distract the Debtors and their principal employees from their efforts to operate and reorganize their businesses.

141.    It is critical that the Debtors continue to receive the perishable commodities supplied by the PACA Claimants.  Any interruption of supply will have a negative impact on the Debtors' revenue and customer good will.  Thus, I believe that the relief requested by the Motion

---

respect to the goods, claims and claimants under those state statutes having an effect and purpose similar to PACA.

[17] The Debtors have filed concurrently with this Motion the Motion of the Debtors and Debtors in Possession for an Order Authorizing the Payment of Certain Prepetition Claims of Critical Vendors in the Ordinary Course of Business (the "Critical Vendor Motion").  None of the claims to be paid under the Critical Vendor Motion are PACA Claims.  There is no overlap between the relief requested in the Critical Vendor Motion and this Motion.

is necessary to preserve the assets of the Debtors' estates and to maintain their ongoing operation.

### XIII. Motion For Authorization to Limit Creditor Access to Confidential Information or Privileged Information.

142.    I understand that a broad interpretation of Bankruptcy Code Section 1102(b)(3) could require the Committee to provide unlimited information to all creditors, regardless of whether a creditor has expressed interest in receiving information, and regardless of the cost to the Debtors' estates. I have been advised further that it could conceivably require the Committee to provide access to all information provided to it by the Debtors, or which is developed through the Committee's exercise of its investigative function, regardless of whether the information is confidential, privileged or proprietary.

143.    I believe the value of the Debtors' estates would diminish and their businesses would suffer harm if Bankruptcy Code Section 1102(b)(3) is interpreted to require the Committee to provide unrestricted access to Confidential and Privileged Information, thereby making it public. Where a debtor operates within a competitive industry, as is the case here, unrestricted access and disclosure of Confidential and Privileged Information to persons who are not bound by a confidentiality agreement could result in irreparable damage to such Debtors, their estates and creditors.

144.    First, I believe that if the Confidential and Privileged Information becomes public, it could easily become available to the Debtors' competitors and diminish the value of the Debtors' estates. If, for example, such competitors became privy to information regarding the Debtors' business strategies and intended initiatives, and adjusted themselves accordingly, the value of the strategies and initiatives would be at the very least reduced, if not eliminated. By way of further example, if sensitive employee-related information becomes available to the

public, such as levels of compensation, the Debtors' estates would diminish in value due to the resulting challenges and setbacks, which would range from decreased employee morale issues to having to defend potential violations of state and federal privacy laws.

145. Second, I believe that unless the protection requested herein is authorized, there may be an incentive for creditors to acquire Confidential and Privileged Information for illegitimate purposes.

146. I believe that the relief requested in by this motion is reasonable and should be approved, and is in the best interest of the Debtors, their estates and creditors.

## XIV. Motion for Authority to Employ Professionals Used in the Ordinary Course of Business.

147. In the ordinary course of the Debtors' businesses, the Debtors retained the various professionals (the "Proposed Ordinary Course Professionals").

148. I do not anticipate that prepetition claims, if any, of the Proposed Ordinary Course Professionals will hinder their ability to render services to the Debtors during the pendency of these cases. In addition, the Debtors are not requesting authority to pay any existing prepetition claims of any of the Proposed Ordinary Course Professionals.

149. I submit that exempting the Proposed Ordinary Course Professionals from completing regular fee applications will result in a reduction of the overall cost of this reorganization because their time will be spent rendering necessary services to the Debtors, not completing, filing and prosecuting fee applications.

150. I believe that the Debtors' postpetition employment of the Proposed Ordinary Course Professionals is in the best interests of the Debtors' estates. In addition, if the Proposed Ordinary Course Professionals are not retained, the Debtors will be forced to retain other

professionals without the background and expertise which the Proposed Ordinary Course Professionals possess with respect to the Debtors' business operations.

151.    I submit that the proposed procedures for retaining additional ordinary course professionals are tailored to give parties-in-interest an opportunity to review the statement of such additional proposed professionals and an opportunity to file objections if necessary.

152.    The Debtors propose monthly payments to the Proposed Ordinary Course Professionals in amounts not to exceed the amounts set forth in Exhibit A to the motion (the "Monthly Cap").  The Debtors further propose that if the aggregate monthly compensation to be paid to the Proposed Ordinary Course Professionals exceeds the Monthly Cap, the amount over and above the Monthly Cap shall be paid subject to Court approval.

153.    The Debtors further propose a case cap (the "Case Cap") for each of the Proposed Ordinary Course Professionals as further set forth in Exhibit A.  If the Proposed Ordinary Course Professionals exceeds the Case Cap, it shall be paid subject to Court approval.

154.    I believe that the relief requested in the motion is reasonable and should be approved, and is in the best interest of the Debtors, their estates and creditors.

**XV. Motion of Debtors and Debtors in Possession Pursuant to Bankruptcy Code Sections 105(a), 363 and 365 and Bankruptcy Rules 6005 and 6006 for an Order (I)(A) Approving Procedures in Connection With the Sale of the Debtors' Assets; (B) Approving Form of Asset Purchase Agreement; (C) Scheduling Auction and Hearing to Consider Approval of Sale; (D) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (E) Approving the Form and Manner of Notice Thereof; and (F) Granting Related Relief; and (II)(A) Authorizing the Sale of Such Assets Pursuant to the Purchase Agreement Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of Certain Executory Contracts and unexpired Leases Related Thereto; and (C) Granting Related Relief.**

A.     **Proposed Sale to Purchasers**

155.     Prior to the commencement of these Chapter 11 cases, the Debtors and Purchasers entered into the Asset Purchase Agreement, subject to higher and better offers and the approval of this Court.

156.     This motion contains a summary of material provisions of the Asset Purchase Agreement. I believe that this summary accurately reflects the Asset Purchase Agreement.

157.     The Debtors have determined that the best method to preserve the Debtors' businesses as a going concern, and to maximize value, is a sale of their Assets.

B.     **The Expense Reimbursement Requested Herein is Reasonable and Should be Approved**

158.     There is no "break-up" or similar fee; I submit, however, that the proposed Expense Reimbursement is necessary and provides actual benefit to the Debtors' estates. Although the Purchasers are affiliated with the Debtors through common corporate ownership, the Asset Purchase Agreement and the Expense Reimbursement are the result of an arm's length, good faith negotiation between the parties. The Purchasers were unwilling to enter into the Asset Purchase Agreement without the protection provided by the Expense Reimbursement, and the Auction contemplated hereby will initiate an overbid process at a floor price that is desirable for the Debtors, thereby increasing the likelihood that the sales price will represent the true worth of

the Debtors' assets. The Expense Reimbursement thus will induce bids that potentially may have never been made and without which bidding may be limited. In sum, the Debtors' ability to provide the Expense Reimbursement enables them to ensure sales to contractually-committed bidders at prices they believe to be fair, while providing the Debtors with the potential of even greater benefit to the estates.

159. Further, the Expense Reimbursement was and is a material inducement for, and condition of, the Purchasers' offer to purchase the Acquired Assets. The Purchasers are unwilling to commit to hold open their offer without such protection.

160. I submit that the proposed Expense Reimbursement will not chill bidding, is reasonable, and will enable the Debtors to maximize the value of their estates. I believe that the Asset Purchase Agreement establishes a legitimate price floor allowing the Debtors to evaluate properly other competing bids that may be materially higher or otherwise better than the Purchasers' bid. In addition, the $1 million cap on the Expense Reimbursement represents less than 0.02% of the amount of the Purchasers' credit bid in Asset Purchase Agreement.

161. Consequently, I believe the Expense Reimbursement is a fair and reasonable percentage of the proposed purchase price. The Expense Reimbursement is customary for similar transactions of this type in the bankruptcy context and, in my opinion, therefore is not so substantial that it provides a "chilling effect" on other potential bidders.

162. I was personally involved in the negotiations of the Asset Purchase Agreement, including the Expense Reimbursement, which negotiations were spirited and at times contentious. The Expense Reimbursement resulted from purely arms-length negotiations between the Debtors and the Purchasers. I believe that, without these protections, the Purchasers

would not have made its offer and such protections are warranted in light of Purchasers' role as the "stalking horse" in the proposed sale.

### C. The Bidding and Auction Procedures are Reasonable and Appropriate

163.   I believe that the Bidding and Auction Procedures and related notices are reasonable and appropriate, and will benefit the Debtors, and their estates and creditors.

164.   I believe that the Debtors will obtain the maximum recovery for their creditors if the Debtors' assets are sold expeditiously, through a well-advertised sale and auction.  As set forth above, the Debtors have engaged a number of professionals over the last 18 months to market their Assets, including Jeffries, CRT and CRG.  Hundreds of potential purchasers and/or investors have been contacted, including within the weeks leading to the Petition Date.  Despite this, they have identified no prospective acquirors other than the Purchasers.

165.   I believe that the Debtors' prepetition marketing efforts, and the proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction should give interested purchasers more than enough time to participate in the Auction.

### D. The Sale of the Debtors' Assets Free and Clear of Liens and Other Interests is Authorized by Section 363(f)

166.   I submit that it is appropriate to sell the Debtors' assets free and clear of liens pursuant to Bankruptcy Code Section 363(f) because one of the conditions therein will be satisfied.

### E. Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

167.   Bankruptcy Code Section 365(a) provides a debtor in possession "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor."  Courts will approve the assumption of an executory contract or unexpired lease under Bankruptcy Code Section 365(a) upon finding that the debtors have exercised their sound

business judgment in determining to assume and assign the Assigned Contracts and/or Designation Rights Contracts.

168. The Debtors will present evidence at the Sale Approval Hearing to demonstrate the financial credibility, willingness and ability of the Prevailing Bidder to perform under the Contracts or Leases. The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Prevailing Bidder to provide adequate assurance of future performance under the Contracts or Leases as required by Bankruptcy Code Section 365(b)(1)(C).

169. I believe that the Proposed Cure Procedures are appropriate and consistent with Bankruptcy Code Section 365. Any defaults under an Assumed Executory Contract will be cured pursuant to the Modified Purchase Agreement with the Prevailing Bidder. Any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to Bankruptcy Code Section 365(f)(1).

170. I submit that the cure procedures for effectuating the assumption and assignment of the Assigned Contracts as set forth herein are appropriate and should be approved.

F.     **The Prevailing Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchasers**

171. The Debtors have presented the proposed asset sale in good faith. The Purchasers are lenders to the Debtors and are owned by entities that also are the ultimate owners of the Debtors. As such, they may qualify as "insiders" of the Debtors.

172. The Debtors have fully disclosed the Purchasers' identity and affiliation with the Debtors. The Debtors have fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed sale and intends to provide notice as directed by the Court. Furthermore, the Debtors will be prepared to introduce evidence at the Sale Hearing regarding

the conduct of arms-length, good faith nature the Auction and the negotiation of the Asset Purchase Agreement.

173.     Based on the above, I believe that the good faith protections in Section 363(m) are appropriate for the prevailing bidder, and that the relief requested by this motion is in the best interest of the Debtors, their estates and creditors.  I further believe that the Bid Procedures and Sale are reasonable, appropriate, and in the best interests of the Debtors, their estates and creditors.

**XVI.    Motion to Assume the Master Distribution Agreement With Sysco Corporation.**

174.     On April 1, 2006, the Debtors and Sysco Corporation ("Sysco") executed that certain Master Distribution Agreement (the Master Distribution Agreement, as it may be amended from time to time, the "Sysco Agreement"), pursuant to which the Debtors retained Sysco to serve as their primary distributor of foodservice products for all of the Black Angus Restaurants.

175.     Pursuant to the Sysco Agreement, Sysco provides certain food products and related services to all of the Black Angus Restaurants.  In addition, Sysco receives products from the Debtors' other vendors, and transports such products to all of the Black Angus Restaurants. The Sysco Agreement provides for thirty (30) day payment terms, pursuant to which the Debtors pay Sysco approximately $4 million per month.

176.     The Debtors, in the exercise of their business judgment, have determined that the Sysco Agreement should be assumed pursuant to Bankruptcy Code Section 365.  As noted above, Sysco not only distributes products and provides services to the Black Angus Restaurants, but it also receives products from other vendors with whom the Debtors place orders, and then transports those products to the Black Angus Restaurants.  I believe that without Sysco's continued provision of products and services, the Debtors will have no food or goods to provide

to their customers and, absent finding a suitable replacement supplier, would likely be forced to close all of their restaurants. Even if the Debtors could enter into a new contract with a similar service provider, I believe that any delay in the provision of goods and services necessary to maintain the Black Angus Restaurants would have a potentially devastating impact on the Debtors' revenue, customer relations and goodwill.

177. I believe that the proposed assumption of the Sysco Agreement is in the best interest of the Debtors, and their estates and creditors.

## XVII. Motion for Authority to Retain KPMG Corporate Finance LLC and KPMG CF Realty LLC as Special Real Estate Advisors to the Debtors

178. By the Motion, the Debtors seek entry of an order authorizing the employment and retention of KPMG Corporation Finance LLC and KPMG CF Realty LLC ("KPMGCF") as their special real estate advisors for these chapter 11 cases pursuant to the terms of the Engagement Agreement.

179. Prior to the Petition Date, the Debtors entered into the Engagement Agreement with KPMGCF, pursuant to which KPMGCF was engaged to market and renegotiate the Debtors' unexpired real property leases.

180. I believe the services to be provided by KPMGCF are necessary and would be in the best interest of the Debtors' estates. Such services are necessary to enable the Debtors to properly evaluate and dispose of their leasehold interests relative to the Closing Locations and thereby discharge their duties as debtors in possession. KPMGCF's familiarity with chapter 11 cases will enable it to render the services provided for in the Engagement Agreement in both an efficient and economical manner and will be in the best interests of the Debtors, their estates, and their creditors.

181.    To the best of the my knowledge, and based upon the affidavit of Harold Bordwin, sworn to on January 14, 2009 (the "Bordwin Affidavit"), a copy of which is attached to the motion as Exhibit B, KPMGCF does not have any connection with the Debtors, their creditors, or any other party in interest, except as otherwise set forth in the Bordwin Affidavit.

182.    To the best of my knowledge, and based upon the Bordwin Affidavit, KPMGCF is a "disinterested person" and represents no interest adverse to the Debtors or to their estates in the matters upon which KPMGCF is to be engaged.

## XVIII. Application to Approve the Employment of Landis Rath and Cobb, LLP as Bankruptcy Counsel To the Debtor.

183.    The Debtors seek to employ and retain Landis Rath & Cobb LLP ("LRC") as their counsel in these cases.  By the Application, the Debtors request the Court to approve the employment and retention of LRC, *nunc pro tunc* to the Petition Date, pursuant to Bankruptcy Code Section 327(a) under a general retainer as their counsel to perform the legal services that will be necessary during the Debtors' chapter 11 cases.

184.    LRC is familiar with the Debtors' business affairs and capital structure, and will be able to immediately assist the Debtors in their efforts in these cases.  Accordingly, LRC has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of this case.  Thus, in order to maximize the value of the Debtors' estates and because of LRC's recognized expertise in bankruptcy law, the Debtors desire that LRC represent them in these cases.

185.    I believe the Debtors' employment of LRC under a general retainer is appropriate and necessary to enable the Debtors to execute faithfully their duties as debtors and debtors in possession and to implement a successful reorganization.

186.    For these reasons, I believe the employment and retention of LRC is necessary and in the best interests of the Debtors, their estates and creditors.

## XIX.    Application to Authorize the Employment and Retention of CRG Partners Group LLC To Perform Restructuring Services And Lisa M. Poulin As Chief Restructuring Officer.

187.    The Debtors seek to employ and retain (i) CRG to provide restructuring services to the Debtors in these chapter 11 cases and (ii) me (a partner in CRG) as Chief Restructuring Officer of the Debtors ("CRO"), each *nunc pro tunc* to the Petition Date, on the terms set forth in the motion and the engagement letter between the Debtors and CRG dated November 17, 2008 ("Engagement Agreement"), a copy of which is attached to the motion seeking such employment. Pursuant to the Engagement Agreement, CRG has agreed to provide my services as Chief Restructuring Officer and those of other CRG personnel.

188.    Based on the professional standing and reputation of CRG, the Debtors engaged CRG on or about November 17, 2008 to provide restructuring services to the Debtors. CRG has extensive experience in providing advisory services in restructurings and reorganizations in large and complex chapter 11 cases. In addition, the Debtors engaged me to be the Chief Restructuring Officer of each of the Debtors. I have extensive experience assisting operationally and financially distressed organizations in out-of-court workouts and chapter 11 reorganizations.

189.    The Debtors believe my retention as CRO and CRG's retention are in the best interests of their estates and creditors. I was not involved in the decision to retain me or CRG.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of January, 2009 at Los Altos, California

Lisa M. Poulin